You may proceed. Thank you, Your Honor. May it please the court, able counsel. My name is Jerry Goldstein and I'm here with my law partner, Cynthia Orr, John Gilmore and Aaron Diaz from our office, and as the court indicated, we represent David Keith Wills. This case has had a long and pretty torturous history. After my client, he testified at the trial, testified that he believed he was being extorted by a woman. He spent the next seven years in various state courts on the same conduct, and seriatim, he was charged in, first, Cameron County, Texas, he kind of moved up the coast, Cameron County, Texas, that case was dismissed, they then charged him with the same conduct in Nueces County, Corpus Christi, that was dismissed, and then in San Patricio County, and that was dismissed in 2017, when he was indicted in the Southern District of Texas, Corpus Christi Division, on this case. That was in 2017, in 2018, we had an interlocutory appeal before this honorable court, and then we sort of piggybacked on a case, U.S. v. Gamble, to the Supreme Court of the United States, in Akron, and we promptly were sent back to Corpus Christi, where we had a three-week trial. My client was convicted of, I believe, 17 of the 18 charges, and he was sentenced to several life sentences, all to run concurrent. We're here today on some, I think, troubling and fairly unique issues, a couple of them. What do you think is your best argument? You've made a lot of arguments, and we respect that, but what do you think is your best argument? I think I'm going to dwell on number one, our point of error number one, that deals with the conflicting lawyer representing both the victim and the mother who pled guilty at the same time. I think that's trouble, it's troubled me. What's your best case that stands for the proposition that you would get a new trial based on that argument? I believe it is the cases that deal with the idea of the right to present a defense. No, I mean your best cite, out of the many cases cited in your brief, what's your best case on this point in your view? If you want to tell me on rebuttal, that's fine. I will. I'll pull it, but there's several cases. I think there's a Ramos case from the Fifth Circuit, U.S. v. Ramos, that talks about the fact that the right to present a defense is the most essential. Right, but that's kind of a general statement. It is. You've got a fairly specific argument here that you think that the mother of Jane Doe was simply trying to extort your client and make money by putting herself in prison, I guess. Well, it's a little more complicated than that, and I want to get to why I think that harmed us, and I'll try and do that quickly. Can you explain that to us? Go ahead and explain that, how you think this prejudiced your client, this dual representation. Well, I'm going to point out the torturous way we had to fight for discovery to finally get there, and what happened was we filed motion after motion. We had Brady discussions. We subpoenaed the lawyer. We tried to depose the lawyer. It became fairly apparent once it was obvious that the mom was going to be a witness and pled guilty. That was our biggest problem, and I opened with that, and the judge made a point on the record. By the way, I'm looking forward to my next appearance. She's very interesting, and I thought, solid judge. I've been doing this 54 years, and I can't always say that, but I can say that this time. Not that that matters. She said, look, why would a mother, and she's telling the prosecutor this. She said, look, everybody's going to believe her. Why would a woman say these things if it didn't happen? I'm going to try and explain to you all why the lawyer's conflict of interest put him in a position where he sacrificed one client while, and by the way, he was still representing mom in that court. He was representing mom and representing your client? No. The victim. The daughter. Yeah, right. The victim. The victim, but how is that causing ... I know from the death row case, the Pam Perillo case, where they represented two people, and one got a good deal, and one got a ... They were having a relationship with one, and one got a good deal, and one got a bad deal. How did this impact your client? Can you explain that, please? There was evidence at the outset that, at least we believe, that this was a sham, and that my client was a very wealthy shrimp farmer, it's a new industry, multimillion dollar plants, all up and down the Texas coast. We believe that he was a target of this woman, and he began ... By the way, there were witnesses at trial who testified that, early on, she began sending him photos and stuff. You're correct, and she was extorting him. Right. Assuming that's all correct. How did this lawyer situation prejudice your client? Because we didn't get to present it to the jury, and I believe that it would have been ... But you made the argument of extortion. I did, but I didn't have the real evidence. There's a difference between when you make the argument ... The guy advertised on his website, which we got before the jury, that he represented people suing sexual predators. Jane Doe did not file the lawsuit until after the conviction. Actually, if you look at the ... We don't know what time they signed the agreement, but the agreement, despite the fact that they had fought us, and I'll really bore you all, but I can belabor how many different times we went to court and tried to subpoena them, and we were blocked at every turn, attorney-client privilege, everything. On the day the verdict came down, the 8th, that same day, they signed an agreement. Right. It's probably they had that all ready to go. Exactly. And that's what we were ... Most people would say that they had that ready to go, but assuming, Arguendo, that you're correct, and this was ready to drop as soon as that verdict came in ... I think it was before that, but once the agreement ... Yeah, but they had it ready to go so that as soon as it came in ... Assuming that makes the most logical sense, because you wouldn't be able to negotiate this kind of agreement right away that quickly in either three days or on the same day, assuming that I believe you on that, what does that ... That's not your veracity, it is your facts.  So what legal claim ... It seems unfair that they were able to hide that, but how do you win as a matter of law, though? Let me put it this way, and this is ... Because I'm troubled by that. I believe that's one of the things that the government didn't ... You've got to have a law. I don't think the government did it to me. I don't think the judge did it to me. I think there was a ... I want to call it a cabal, that's my hyperbolic way of describing it, but I think that that was what was going on, and here's what I want to ask you. If the jury bought, and they apparently did, the idea that this mother would prostitute her daughter in order to get cell phones for her daughter, a trampoline, a promise that maybe her education would be paid for. If the jury will buy that, then why wouldn't they buy the idea that this supposedly high-powered lawyer was going to get them millions of dollars if they ... That, to me, would have been a wonderful argument that I didn't get to make. Why didn't you get to make that argument? Because we didn't know until ... Because, like you said, they hid that from us. They fought us at every turn. You knew that was a possibility, and you did make the argument that you were supporting. I did, but I had ... Absolutely. I just didn't have the evidence. But there's a little bit of a difference when she's secretly giving her daughter as a prostitute versus pleading guilty to a crime for which the minimum sentence is 15 years, which she got. That is a little different in terms of extortion. I'm not saying that she didn't do that. The jury concluded she didn't, but I wasn't there. But the bottom line is, that is a little bit of a different situation to decide that it's worth a million dollars to go to prison for 15 years. Probably more than a million, but that suit's still pending. Here's the point. If she was willing to do all that, as the government claimed, to get her daughter these little gifts, imagine how ... If the jury bought that, imagine how much more powerful my argument would have been with them, that she's going to ... After the jury heard all the evidence of abuse, how would it make any difference if they had more evidence that he was going to be sued after this was over with? How could it affect the jury enough to be a game changer? Don't you think that ... I've been doing this a long time, I'm not the world's best, but I think I should have been able to present to the jury, and at least I should have gotten a hearing on the motion for a new trial, so that I could explore the idea, because I think we were deprived of a fair trial, because I think it makes a difference when you have a lawyer who is representing a mother, throwing her under the bus, because he's got a 40% interest in a multi-million dollar suit to help. I think that adds a lot of weight to me, and I think it would have added a lot of weight to the jury. If the jury bought the idea that she did it for trivial stuff, then I think it would have been a lot more ... Juxtapose that between, well, she got a trampoline and a cell phone and a stereo, against millions of dollars. That assumes that's the only reason the woman testified. She did have other siblings putting pressure on her to bring this guy to trial. There was testimony to that effect. Our belief was that she had initiated this with her daughter in order to get him in the crosshairs. He was a duck out of water down there. This guy from the D.C. area ... Let me ask you something that's a different area, because we're getting towards the end of your time. This whole herpes argument, I'm a little bit confused about. Why would you only make that argument if he testified? Because it seems like a fairly important question. There's this argument that Jane was not tested for that, why that wouldn't happen, why you wouldn't get her tested, and then make the argument that if he had sex with her a hundred times and he had herpes and she didn't have it, how could that be true? That seems like a promising argument, but you all weren't going to make that unless he testified, and you said you weren't sure he was going to testify until you got to that point in the trial. I'm just confused about that. Why wouldn't that be a centerpiece of even trying to get the indictment withdrawn? I didn't want to run the risk of making that the centerpiece if he wasn't going to testify, and that was his choice, not mine. Why? Well, because I wasn't sure we could offer his medical records without some kind of authenticity. Don't forget, the medical records were from South Africa. He was an investigator with the Humane Society at the time. Couldn't you get them certified in South Africa? We ultimately did. Why can't you at least offer that? You offered a lot of things that didn't get in, at least you offered them. We did, and I believe that the right to offer evidence like that should have trumped— No, but I'm saying send it to the other side and be arguing that from day one, because at the end of the day, the prosecutor isn't just trying to win a case. If they think someone is innocent, they have to pursue that. They have that ethical obligation not to try to convict someone who is innocent. And so if you think that argument is a winner, I mean, I'm just surprised that it was kind of slid around and it's just a few pages, and I'm thinking, what? So what am I missing? We believed we couldn't offer it, and we were fighting to get—and I think our best argument is the last one. It's point of error 12. You asked me how I wanted to do this, and I think that's a fair question. I've only got one minute, but I will tell you that that was a difficult decision on our part with respect to that. And we fought—if you look at the transcript, we fought day in and day out attempting to get her medical records to demonstrate that she didn't have herpes simplex, and we had a doctor prepared to testify. And they fought us at every turn, and that was her medical records, and we weren't entitled to them. The government had no incentive to get her tested if they didn't know that they didn't have the evidence about your client. Well, but for all we knew, she had gotten them from someone else. It wasn't going to be as important if we didn't have proof that she didn't have it. Can I at least touch on— Yes, please. You can have two minutes to address point of error 12, since you say that's your best argument, and Ms. Wilson can have two additional minutes in her time as well. She uses hers better than I do, Your Honor. In particular, I'm concerned there were nine counts—I think counts 3, 5, 7, 9, 11, 13, 15, 16, and 17—all of which alleged that in the court's charge and in the indictment that what the jury had to find is beyond a reasonable doubt that defendant Wills could be charged in Texas under the Texas Penal Code, and by the way, by statute. I mean, they list it by code, number. We filed written objections, and we said, look, you can't—it could have been charged. Who charges? What's the standard? It ought to be beyond a reasonable doubt. But it's a statute. So the statute requires more things. It requires interstate commerce and so on and so forth, and then it could be charged as a piece of that. And it's the most important piece, because that's the sine qua non, that's the essence of the offense. And if you look at the assimilated crimes statute, Title 18, United States Code 13, it actually says that whoever is guilty of committing the crime—and that's what this was, an assimilated crime. And I can only tell you that what we're concerned of—and by the way, the judge said this is a troubling issue. She understood, because our argument was, how can we be—how can we be convicted by a jury that just says we could have been charged with something? They didn't have to— He gave them the elements of a state crime. He charged the elements. Right. But it was only—and the charge and the indictment only say if you could be charged, not convicted. And by the way— That's what the statute says. Exactly. And that's the problem. And by the way, that's what Judge Ramos said. That's the problem, is the statute. And let me just—can I— You're saying the statute is unconstitutional. I think—well, here's how Judge Posner on the Seventh Circuit threaded the needle in 2009. What happened there is the same issue came up. It's the only time I've seen it really come up. And the judge says, look, the judge did not commit the fallacy of a contextual, I guess, in interpretation. I guess that means it's out of the context of a criminal trial. He told the jury that it had to find that the defendant had violated a statute and that the government had to prove that violation beyond a reasonable doubt. The judge could have been clear. However, they inversed it on a different grounds, which I hope you will. The jury on retrial, he should be told that although the statute uses the word can be charged, that he should instruct the jury that really what that means is that they did commit the crime. Otherwise, this is—it's like Judge Wachner's—I don't want to compare myself to a ham sandwich, but any of us could be charged. By whom? By what standard? This—you can't—and, by the way, I don't think many—this has come up before, but I think this is an issue, by the way, that doesn't clear us out of this case. It's—what? Mr. Goldstein, you've used your time and the additional time that we allotted you, so your time is up, but you've saved time for rebuttal. Thank you. Thank you. May it please the court. Eileen Wilson on behalf of the United States. Wills doesn't challenge the overwhelming evidence that for three years he sexually assaulted Jane Doe starting when she was 10 years old. Instead, he raises mostly procedural and evidentiary points, but the record disproves— What about this herpes point? Doesn't that concern you a little bit? I mean, if he was having sex with her 100 times and he had herpes and she didn't get it, then how—doesn't that make you wonder, was he really having sex with her all those times? Absolutely not. There was plenty of evidence he was having sex with her. So you're saying that you don't think that she would get herpes from him having sex with him 100 times? I'm not a medical doctor, but what I do know is that sexual victims such as Jane Doe are subject to what is called a SANES exam. And the SANES examiner testified— No, I know that they said she wasn't tested for that, but I'm just saying in your core as a prosecutor, you have to care whether somebody who is innocent has been convicted. That's something you have to care about, right? Of course. And so doesn't this make you wonder? Are you not wondering whether she has it? Your Honor, quite frankly, there was a plethora of evidence that she had sex with this man through coercion. But the fact of the matter is her pediatrician records and the SANES exam did not show any testing for herpes. So maybe she did have it. We don't know. But the fact of the matter is the SANES exams are used on a national basis. They are a humiliating exam for any woman, let alone a young child. And this nurse testified about the protocol for that. She was examined for—or tested, rather, for chlamydia, gonorrhea, and some other things. But that's just not part of the protocol. Plus, while, yes, these records were introduced, he wanted to introduce the medical records, when the United States specifically asked before trial whether he had any medical records, he represented he was not going to introduce any. And the judge made a notation of that in her docket sheet. But also, how do we know these records are really legitimate? I don't mean necessarily to impugn a doctor, but how do we really know? This is a foreign doctor. We didn't have the opportunity to explore it. We were told it wasn't going to happen. So there are a lot of things going on here. But the fact of the matter is he got this evidence before the jury about the herpes. Even though he wasn't allowed to introduce the medical records, he specifically testified about having herpes years before. And when he was shown the records that weren't able to be admitted, he said something to the effect, yes, that's it. So what he did was essentially the whole discussion suggested to the jury that they were chronicled somewhere. So, no, it's not disturbing, particularly when you have the SANES exam. You have hotel receipts. You have restaurant receipts. You have checkpoint records showing the cars meeting up or going one way or the other. You have cell phone location. There was a lot of evidence here. You have school records showing when Jane was checked out of school for an alleged doctor's appointment, but the cars are going north or south so that Jane's mother can prostitute her daughter. Jane testified also at length. The jury was able to evaluate her credibility. That's extremely important. And his. Yes, exactly. But the fact of the matter, he was given every opportunity to not only investigate his case but to defend himself. Counsel, I have three different areas that I have questions about. The first one we've already talked about with opposing counsel about the contract or the representation for the civil suit. You know, the discovery request asked for any and all statements made by Jane Doe with Richard Nunez. So it said that there were. Is it your position that there is no communications available whatsoever between Jane Doe and or her guardian and the attorney from before when the agreement was signed? Because those were supposed to be disclosed and that, you know, there was a representation that there weren't. But it's just highly unlikely that poof, there would be this representation agreement if there had been no communications. There was a hearing and at that hearing, the other side tried not to give Jane Doe notice. And the judge went through all of this, all of the analysis of that and was very disturbed by that. And a couple of things happened at that hearing. One, the judge said that Mr. Nunez would have to produce any contract. And there was an existing contract between him and Jane's mother for her criminal actions. And number two, I think this court needs to remember, there was a historical relationship here with the Lasoyas and Mr. Nunez. The mom's sister used to work for Nunez. When the mom got out on parole or probation or bail, rather, she did some work for them. Nunez had represented her in her prior divorce. He also had represented her when the mom's brother sued her. That makes it even more and more likely that they've been talking all along about, hey, when this all comes down, we need to wait because it might hurt the credibility at the trial, but then we're going to do this. That makes it even more likely that they know each other. They're talking regularly. But here's the thing. They did not do their briefing. I couldn't find anything. 30,000 pages. I looked and looked and looked. The district court gave them two weeks to get back to the court about all of these 17C issues, which, of course, involved Jane. And I don't see that they ever did that. But the fact remains, the only existing legal contract they got, which is, as I said, the Nunez contract. But the discovery required more than just the contract. It required any communications. And so they should have had all of those communications. But they never followed up regarding Jane. And, plus, you have to remember that at the trial, Jane specifically testified that there was no lawsuit. They tried to impugn her credibility by introducing that file that was found on her phone called Before Filing Lawsuit. But that backfired on them because what that, under the rule of optional completeness, that file was about CPS and other things, and at the time, Jane was in foster care. So she clearly was trying to figure out what was going to happen to her. And remember, she's still a child. So she must have been, what, at that time, roughly 13, 14 years old. The other thing is they never subpoenaed the guardian at trial. There's no indication that they, you know, he was there. They could have served him with a subpoena. I just didn't, while this might have been ripe for inquiry and further study. They didn't follow up. They didn't do their homework. So if there is something to be found, it was on them. It's your position. Either they didn't do their homework or they made strategic decisions. And it's probably the latter. Okay.  I have two more real quick. One has to do with these jury having conversations with counsel or else with the court staff or the juries have worked out their difference so they don't need a conference with the judge. How does the lawyer know that the jury has worked out their differences and they don't need a conference? I think they must be talking to the bailiff, and that's a problem. When we had that case from the northern district or was it the eastern district? The eastern district. The eastern district where the bailiff and the law clerks are all talking to the jury. And they're not supposed to be getting this information from the jury. And so was any type of hearing held or follow-up or maybe you know something about this that I don't from the record. The lawyers and the judge learned that a juror thought that she had been bullied. How did they learn this? I believe it was from the bailiff. That's exactly the kind of communications that are not supposed to be taking place and which are very problematic. But the juror, well, so the juror essentially The juror said it to the bailiff rather than the bailiff saying something to the jury. That's my understanding. There's a limited record on this, but that's my understanding. And the juror had come out and said something like, I'm not going to do this anymore, something to that effect. Another juror said, come on in, and so they went inside. Meantime, the judge, and the judge who always tried to get things right, in my opinion, and the lawyers learned about it. The judge says, look, we may need to call them in here and have a hearing and whatnot. So while they're discussing this, they learned that things had worked out from the bailiff again. But there's no indication the bailiff's involved in the deliberations or whatever, what you had. Or the bailiff telling them things. If they tell the bailiff something, that's different from the bailiff telling them something, right? Again, it's a very limited record. No, but I'm asking, just in general, isn't that different? If some juror comes running out of the room and saying, I hate the bully, that is different from the bailiff going in, you don't have to put up with a bully, juror, I want to tell you that. Those are two very different circumstances. The bailiff can't go knocking on the door, come in, and say, let me be the mediator. Right, and that was the allegation in the Eastern District of Texas case. Exactly, totally different here. Well, what I was saying, Judge Davis, is that lawyers were discussing this. There was going to be a hearing. The judge made the decision to hold a hearing. But when they heard that it was resolved from the bailiff, or that they had gone forward, both the government and Will's counsel were fine with that. They represented that on the record. After the verdict came down and the jury was polled, each juror said that it was his or her verdict, and the lawyers accepted it. So they waited, essentially, to the 11th hour to raise this after representing that they were fine. And they didn't get any affidavits after the fact that said I was bullied and blah, blah, blah. No, and as some of you are former district court judges, you know that the responsibility is on the lawyers to make contemporaneous objections so you can resolve the issue. Yes. And that did not happen here on many fronts. My last area of inquiry concerns the prosecutors allegedly threatening witnesses with perjury prosecutions. What is the law in that, and do you maintain that the prosecutors stayed within the lines? Absolutely. What we have is a former prosecutor. On the eve of trial, this came up after waiting a long time, and Mr. Canales, Tony Canales, who represented Mr. Aquilino, was the one who said that his client had been threatened, and he didn't have any information regarding what kind of evidence Aquilino would have been able to offer the defense. All we had was this blanket assertion, and we think it probably happened in conjunction with the bail hearing where Aquilino testified to this or that. And so maybe a conversation subsequently did occur that along the lines of, look, if you're going to not be truthful or whatever, you're going to be charged with perjury. And this court has a long history of cases in that regard. I cited a lot of them in my brief that you are allowed to tell a person that they could be charged with perjury. There's nothing wrong with that. Why did you all even pursue this number 18 when it's only got five years and the other 16 have life? I guess I'm just wondering why we're spending so much. I understand that you are entitled to a vacator of a conviction if it's improper, regardless of the effect on your sentence. I totally get that. But I'm just curious why this is such a big part of all of this when it's really having nothing to do with his sentencing. Well, you're correct. Or very little to do. I understand he was concurrently sentenced to five years. And, again, I respect all of the rules on that, but I'm just curious about the sort of reality of it. Well, I'm not involved in the charging decisions. I'm just, you know, the representations and warranties type. But the fact of the matter is perhaps they felt that was the right thing to do since — That was a backdoor in case he won the other 17 and they would at least have him in prison for that. Well, he shot up evidence. I mean, he took a gun to a computer, a computer that may have had all types of text or even photos. Jane, of course, as you know, her mother had to buy her provocative clothing, and they cut off the head when they sent the pictures. But perhaps they would have been on there, too. And so they wanted to present the jury with as much evidence as possible, and that fed into that. And it also, quite frankly, was a reflection on his credibility because Sarah Benz, the witness at trial, she had to be arrested in order to testify. And while she provided some very solid evidence in favor of the counts against Jane, she did so very begrudgingly. But she's the one who testified, essentially, that she gave the computer as directed. Yeah, I know. I know what she said and all that, but I was just wondering about that. That's fine. I mean, I understand. Yes. But where I want to go back to is that the court was very – oh, and one other point in relation to your question, Judge Elrod. On 640 – excuse me, 6432 of the record, Richard Nunez does a declaration. And in that declaration, he specifically says, I was retained by Richard Lasoya, who is Jane's guardian, to represent the interests of his minor sister, the victim of his case, on October 8, 2019, after the jury returned its verdict in the trial of David Keith Wills. So that essentially negates that there was any air traffic, if you will, about that. But, again, I understand where the court is coming from, but I just wanted to offer that. But one thing it's important to remember is, before trial, that he received the existing contract. And then before the testimony was offered in this case, both during Vordaer and during opening statements, he started laying the foundation that Jane, her mother, and Nunez had schemed against him for money. And he aggressively cross-examined all the people at trial about that. And his witnesses, as well, most importantly, as himself, he talked about this extortion also. But the jury rejected it. It's a preposterous theory. As Judge Haynes, I believe, said, the mom was willing to go to prison for 15 years. We recommended 25 years for the mom. And the judge got upset with us because we said the judge thought she was such a critical witness to us and we weren't being fair, if you will. But, so, and then Nunez… 15 years was the minimum, right? Yes, but we wanted to… She got that. Right. But what I'm saying is she got that. Right. So, certainly it is possible someone could decide to go to jail for 15 years for a million dollars or millions of dollars. But that is a little different from prostituting your kid for money. For an iPad and things like that. Again, I'm not saying either one's a good plan. I'm just saying to me they are different. Right. And we don't even know if that were the case that Nunez would have had his bar card after all this. And to the extent there's a conflict in his representation, that rests with the state bar. Nunez is the one who needed to say there's a conflict or there's not a conflict. That's a lawyer's job. It's not Richard Lasoya's or Mom's or certainly Jane's, who's a child. Does the record reflect any proceedings with the state bar or reports to the state bar? Not to my knowledge, no. I know of nothing along those lines. But the other thing I wanted to say was Mr. Goldstein briefly mentioned the civil lawsuit. And while I know it's outside the record, I will say that to me it looks like a judgment was entered. We were not able to obtain the judgment just because we don't have access to that information. And it looked to me as though the lawyers that Wills had. If you're going to talk about things, you need to submit a 28-J and let them have a chance to speak. It was just in response to what he said up here. Right. But I'm just saying you can submit a 28-J and they can submit within three days a responsive one if you're going to give new information today. Okay. There's enough in the record. We don't need to add to the record. It's a big one. It certainly is, Your Honor. But the other thing I just want to say is the district court in this case was careful during every single stage of the proceeding. There were numerous hearings. Sometimes the judge's docket entry shows that the parties are supposed to work on these issues because the judge kept trying to get them to resolve things and to essentially limit the case or narrow the case for trial because there was so much going on. And she disallowed certain evidence because it hadn't been produced. But by the same token, she also always heard and tried to make a good decision. And going back to that's essentially what you were talking about with the bailiff because the court's first reaction is she didn't wait for the lawyer. She said we need to hear a hearinger. Let's get this cleared up. And the record's peppered with other situations like this where the judge said let's work this out. I want to make sure that it's clear and whatnot. And so to the extent certain things are vague or whatnot, that falls on the parties. That falls on the lawyers. Well, of course, we are not criticizing the district judge. No. But you can reverse a district judge who's excellent, and you can affirm a district judge who's excellent. Absolutely. The reality is even amazing, brilliant, wonderful district judges can get reversed. And even a little less than brilliant, if such a district judge exists, could be reversed, right? So, I mean, that's not the question, isn't what we think of Judge Ramos. It's what we think of the evidence here and the arguments here. The answers here are all in the record, and they're all supported by a lot of evidence. And unless the court has any further questions, I will sit down. Thank you. Thank you. You've saved time for rebuttal, Mr. Goldstein. Thank you, Your Honor, and I think I'll try and be brief. There is a lot of paper in this case. First, with respect to the herpes issue, I am troubled by that. And the reference was made by ABLE Counsel for the government that this was a foreign doctor. His name is Magdala, but he's the dean of the University of Texas Medical School in San Antonio. He's a very reputable doctor. And, you know, we weren't. But what she's saying is they weren't able to check on this whole thing because it wasn't produced until the middle of trial. I understand, and I'm not belaboring that. But I do think fair trial issues, I think Judge Elrod was on a panel, and I think it was a procurium. Judge Procurium writes a lot of opinions. And I believe the opinion said that things like compulsory process and fair trial trump the rules of evidence, and it was a discovery issue just like that. I also would like to say that the idea that Mr. Nunes didn't have a conflict, come on. I mean, he is representing mom at a sentencing. Does it matter that his conflict was not with your client? I mean, it wasn't like he represented your client and the mom. That would be a conflict. Judge Haynes, definitely it makes a difference. But what I'm saying is that that weird, tortured relationship between the three of them, you know, what it did, and I think the jury should have been able to decide this. I don't know if we can all make our own judgments on what it is, but I think harm ought to be decided. But what if he had gotten, was able to show the jury that this lawyer had a financial interest, a large one. He got 40% under that contract. That he had a big financial stake in getting one client to plead guilty and testify in order to make him money off the victim. But wasn't it clear to the jury that regardless of whether there's a current contract or not, if they convict your client, then Jane can sue and potentially make a lot of money? That's not the – Wasn't that clear? That's not the issue. It is that it is mom. It is that the witness is being manipulated by a lawyer who is supposed to be helping her, for example, at the sentencing. He's still representing her at the sentencing. But for them to even have gotten to the doorway, according to you all, they have to have lied from the start. Absolutely. Jane calling up the sister and all of that has to have been a lie from the start. Right. So it's not just one thing happened at trial that you have to explain. No. I mean the whole thing, according to you, is a lie. Well, and think about this. He's representing mom at a sentencing and there's a restitution issue. And he's got his other client who is the one that's receiving that. And he manipulates all that because he wants to keep that civil suit alive. And I did want to point out, if I could, that when – by the way, at her – at the trial, the mom actually testified that she wanted – she thought she might get probation. And Nunez had cut a deal for her in San Patricio County for six years. And he argued to the judge that that should have still been the good deal because they were acting in concert. I thought there was a minimum sentence. There was, but there was a – the idea was a 5K was being offered to her, and that would have allowed the judge to give her probation or ten days. She was aware that she could get 15 years or more. Absolutely. Absolutely. But – Walking in and pleading guilty and confessing to this is not a minor event on her part. No. It's not minor. But I mean – but the trivial stuff she was going to get under the government's theory is even more bizarre to me than if she could get millions. And if she loved her daughter that much, did she do that kind of thing just so her daughter could get these toys? I just think I had a better argument the other way. But that's Goldstein for you. But if I could, one other thing I'd like to point out is the – you touched on it, Judge Elrod, the idea of the discovery. We – not only did we – and you're right. I mean, I – we asked for all the contracts, et cetera. Then at another time, we actually get in and we start talking about we want any contact that Jane Doe had with Nunez. We never got any of that, even though the judge ordered them to give it to us. We then subpoenaed Nunez, and we got – and it's in the record. You'll see it where in one of our motions we trade communications with Martinez, who was the former AUSA, where he tells us. I'm not bringing – you will not get the guardian to come to court because he says he doesn't have any records. And my representation is enough. Just if I can close, I promise. I actually went to court and actually set all this out, what I was worried about, on the record, and told the judge, look, we should be entitled to present this evidence, and we're not getting anywhere. We're being frustrated by motions to quash the subpoenas, and they hid behind the attorney-client privilege. And, for example, the guardian had no attorney-client privilege with anybody, and yet we were denied that opportunity. And I want to thank the court for its patience. You've been very kind today. Thank you. Thank you. We have your arguments in this case, and the case is submitted. Thank you very much.